(No. 88885.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appel-
lee, v. MARK BALLARD, Appellant.

*Opinion filed August 29, 2002.—Supplemental opinion filed on
denial of rehearing December 2, 2002.*

154

McMORROW, J., specially concurring.
HARRISON, C.J., and KILBRIDE, J., dissenting.

Charles M. Schiedel, Deputy Defender, and Kathryn Saltmarsh, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield, and Joseph E. Birkett, State's Attorney, of Wheaton (Joel D. Bertocchi, Solicitor General, and William L. Browers and David H. Iskowich, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Following a bench trial held in the circuit court of Du Page County, the trial judge found defendant, Mark

Ballard, guilty of first degree murder (720 ILCS 5/9—1(a) (West 1996)); robbery (720 ILCS 5/18—1(a) (West 1996)); concealment of a homicidal death (720 ILCS 5/9—3.1(a) (West 1996)); unlawful possession of a stolen motor vehicle (625 ILCS 5/4—103(a)(1) (West 1996)); and armed robbery (720 ILCS 5/18—2(a) (West 1996)). After finding the defendant eligible for the death penalty and hearing aggravation and mitigation testimony at the subsequent sentencing hearing, the trial judge sentenced defendant to death for the first degree murder conviction. In addition, the trial judge imposed a 5-year sentence for the concealment of a homicidal death, a 7-year sentence for unlawful possession of a stolen motor vehicle, and a 60-year sentence for armed robbery; sentences to be served concurrently. The death sentence has been stayed pending direct appeal to this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a). For the reasons that follow, we affirm both the convictions and the sentences.

## BACKGROUND

This case involves the murder of Patty Noland. The primary evidence used by the State against defendant came from defendant's own admissions to his family, friends and to police, which can be summarized as follows. In October 1997, defendant was living at a residence owned by John McGuire. Noland had previously lived at this residence, but had recently moved out and was living with her boyfriend. However, Noland had left some of her clothes at McGuire's house and had yet to retrieve them. While McGuire normally resided at his home, he was staying with his girlfriend from approximately October 25, 1997, through the beginning of November 1997, but left the care of his dog with defendant.

On October 29, 1997, around 8 p.m., defendant wanted a car and money so that he could go to Elgin and buy drugs. Defendant thought of Noland. Knowing that

Noland would not lend defendant her car and money, he thought of robbing her by first luring her to McGuire's house under the pretense that she could pick up her remaining clothes. Once there, defendant would knock Noland out with chloroform and handcuff her down in the basement. However, thinking that Noland could later identify him, defendant's thoughts ultimately turned to murder. To that end, defendant called Noland at the restaurant where she was a waitress working the 5 p.m. to midnight shift. Defendant told her to come over to McGuire's house to pick up her clothes after she was done with work, but requested that she call him before coming so that he would know when to expect her. Noland agreed.

While defendant waited for Noland's call, he retrieved a bottle of chloroform from McGuire's room and put it in a box next to the front door so that Noland would not recognize it. Defendant then wrapped a hammer in a bath towel and placed it in the entranceway. Defendant also laid a blanket out on the floor in the front living room so that he would have something to wrap the body in. In addition, defendant retrieved a pair of handcuffs from McGuire's room and put them in his back pocket.

Noland called defendant around 10:30 p.m. to let him know that she was on her way to pick up her clothes. Defendant asked her to bring him a soda.

After Noland's call, defendant soaked a rag with the chloroform. When Noland arrived in the driveway, defendant grabbed the rag and held it in his hand. Upon Noland's entrance into McGuire's house, defendant asked her for his soda. Noland responded that she had left the soda in her car and for defendant to get it himself. As Noland proceeded to walk further into the house, defendant grabbed her and put the chloroform-soaked rag over her face. There was a struggle and both fell to the ground onto the blanket that defendant had previ-

ously laid down. When defendant realized that the chloroform was not having an effect on Noland, he held her down while he grabbed the hammer and began to hit her on the head. Defendant continued to keep the chloroform rag over Noland's face as he hit her on the head with the hammer. After hitting Noland approximately 30 times, defendant got up to wash the blood off his hands. As he was washing his hands, defendant heard Noland mumbling. Defendant then attempted to stab Noland with a knife in order to "finish [her] off" and to "prevent her from suffering any more," but the blade bent on impact. Defendant then retrieved a three-foot-long screwdriver or pry bar and hit Noland in the side/rib area a couple of times. Defendant next proceeded to take a number of McGuire's things, such as a TV, two VCRs, and a stuffed owl. He put the items in Noland's car. Defendant went back into the house and put McGuire's dog in McGuire's room. Worried that Noland's boyfriend might come looking for her, defendant wrapped Noland up in another blanket and dragged her body in front of the couch and out of view from the window. Noland was still mumbling so defendant put the handcuffs on her, thinking she might get away. Defendant then set white plastic bags filled with clothes next to Noland and leaned two bikes against her to conceal her body. Defendant took money from Noland's purse which she had left in the car, and before leaving in Noland's vehicle, defendant turned off the lights and locked up the house.

McGuire testified that he received a telephone call on October 31, 1997, from defendant. McGuire asked defendant for a ride to the store. Defendant drove McGuire to and from the store in Noland's car. McGuire asked defendant how he had possession of Noland's car and defendant responded that he had dropped Noland off at work.

On November 4, 1997, McGuire became concerned

about his dog because McGuire had been unable to contact defendant for a few days. McGuire asked a friend to drive him to his house. When he entered his house, he detected a foul odor. McGuire found his dog in his room and noticed that his dog had lost a lot of weight. McGuire had his friend drive him to the store to buy some dog food. After returning to the house, McGuire looked around and noticed some items missing from his home. McGuire also saw blood under a rug that he normally kept by the front door and proceeded to lift up a corner of the blanket covering Noland's body and saw a large mass of blood. At this point, McGuire dialed 911.

Sergeant Jeffrey A. Driskill of the Hanover Park police department responded to the scene. When he arrived, he detected an odor he recognized and associated with decaying human flesh. Noland's body was discovered underneath the bikes, clothes, and blankets; exactly how defendant had left her. Sergeant Driskill carefully noted where each item was placed in and around Noland while the items were being removed and inventoried. In fact, Sergeant Driskill videotaped the scene of the crime before and after the items were taken off the body.

Detective John Dossey of the Hanover Park police department was also at the crime scene and was the lead detective in the investigation. On November 5, 1997, Detective Dossey observed the autopsy of the body and received confirmation that the body was that of Patty Noland. The autopsy revealed that Noland had died from craniocerebral injuries due to multiple blunt-force trauma with the chloroform exposure, and the handcuffed wrists playing a part. Detective Dossey instructed officers to look for defendant.

On November 7, 1997, at approximately 8:15 p.m., officers from the Broadview police department saw Noland's car in a parking lot of a strip mall and detained defendant after a foot pursuit. Defendant was arrested

based on a warrant for unlawful possession of a stolen motor vehicle and taken to the Broadview police department, where he remained until Detective Dossey and Detective Edward Piacenza, also from the Hanover Park police department, arrived to escort defendant back to the Hanover Park police station. Upon meeting defendant, Detective Dossey introduced himself and Detective Piacenza as detectives with the Hanover Park police department. Defendant immediately stated that he was "glad it was over" and that he was "tired of running." Detective Dossey told defendant that they would talk later at the Hanover Park police station.

By 9:45 p.m. Detectives Dossey and Piacenza had returned with defendant to the Hanover Park police station. The detectives placed him in a room to conduct an interview. At approximately 9:50 p.m., Detective Dossey gave defendant *Miranda* warnings, reading verbatim from a preprinted *Miranda* warning and waiver form. After defendant indicated that he understood his rights and signed the form, he admitted to murdering Patty Noland as detailed above. He also admitted to having committed a number of burglaries.

While Detectives Dossey and Piacenza were interviewing defendant, Sergeant Driskill inventoried Noland's car, and upon finding various items in the vehicle, including bloody clothing and a pair of tennis shoes, coordinated his efforts with those of the investigators who were interviewing defendant. Defendant identified the clothing and shoes to be those he had worn while murdering Noland.

In the early morning hours of November 8, 1997, Assistant State's Attorney Timothy Diamond met with defendant and informed him that he was not his attorney, but was an attorney for the State. Defendant responded that he understood the prosecutor's role. Diamond reviewed defendant's signed *Miranda* form with defen-

dant, confirming defendant's understanding of his rights. Defendant then relayed the facts of Noland's murder and the burglaries to Diamond and signed a written confession.

At defendant's trial, defendant's biological father, Charles Stophlet, defendant's cousin, Walter Petersen, Jr., and McGuire's girlfriend, Judy Mullins, each testified that prior to defendant's arrest, he had contacted them and admitted to having killed someone. Additionally, via stipulation, forensic examinations of the physical evidence found at the crime scene and in Noland's car revealed that the stains on the pants and shoes defendant admitted to wearing during the murder were indeed human blood, and the sample of liquid taken from the scene was chloroform. Detective Dossey and Assistant State's Attorney Diamond both testified to the circumstances and substance of defendant's confession.

Defendant presented his case through one very short stipulation concerning the testimony of Judy Mullins and Walter Petersen, Jr. Namely, that if called to testify, Detective Edward Piacenza would state that he interviewed Judy Mullins on November 13, 1997, and that Mullins did not want McGuire to find out that defendant had gone with her to her apartment on an occasion prior to the murder of Noland. In addition, if called to testify, Detective Dossey would testify that on November 7, 1997, he and Assistant State's Attorney Diamond spoke with Walter Petersen, Jr., and Petersen stated that on November 1, 1997, defendant told him that he was feeling bad for what he had done. Defendant waived closing argument. A theft charge against defendant was nol-prossed. As mentioned at the outset of this opinion, the trial judge entered judgment on his finding defendant guilty of all remaining charges.

After admonishments from the court, defendant waived a jury for both the eligibility and penalty phases

of the sentencing hearing. All evidence presented at defendant's trial was readmitted at the eligibility phase. Upon completion of the first stage of the sentencing hearing, the trial judge found defendant eligible for the death penalty (720 ILCS 5/9—1(b)(6), (b)(11) (West 1996)) because defendant was 18 years of age, the murdered person was killed in the course of another felony, the murdered person was actually killed by defendant, and in performing the acts which caused the death of the murdered person, the defendant acted with the intention to kill the murdered person or with the knowledge that his acts created a strong probability of death or great bodily harm, and that another felony or more was committed, and the murder was committed in a cold, calculated, and premeditated manner, pursuant to a preconceived plan, scheme, or design to take a human life by unlawful means, and the conduct of defendant created a reasonable expectation that a death of a human being would result therefrom.

At the second stage of the sentencing hearing, all of the evidence presented at defendant's trial and eligibility phases was readmitted at the penalty phase. After considering evidence in aggravation and mitigation, evidence which we will later discuss in more detail, the trial court found no mitigating factors sufficient to preclude imposition of the death penalty and sentenced defendant to death for the murder of Patty Noland. In addition, the trial court imposed a 10-year sentence for concealment of a homicidal death, a 14-year sentence for unlawful possession of a stolen motor vehicle, and a 60-year sentence for armed robbery; the sentences to be served concurrently.

The trial court denied defendant's motion to reconsider sentences pertaining to defendant's sentence of death and his sentence of 60 years for armed robbery. However, pursuant to defendant's motion and agreement

by the State and the trial court, the sentences imposed for concealment of a homicidal death and unlawful possession of stolen motor vehicle were modified to five and seven years respectively. Additionally, the trial court denied defendant's "motion for judgment notwithstanding the verdict" or a motion for a new trial. Defendant appeals directly to this court pursuant to Supreme Court Rule 603 (134 Ill. 2d R. 603). Additional pertinent facts will be discussed in the context of the issues raised in this appeal.

## ANALYSIS

### I. Suppression of Statements

Prior to trial, defendant filed three motions to suppress his incriminating statements, which the trial court denied. In these motions, defendant claimed that the State: (A) denied his sixth amendment right to counsel (U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8) and (B) his statutory right to be presented to a judge "without unnecessary delay" (725 ILCS 5/109—1(a), 109—2(a) (West 1996)). Defendant assigns error to the trial court's denial of his motions to suppress.

We address at the outset defendant's argument that we should review this contention *de novo*. At a hearing on a motion to suppress, it is the function of the trial court to determine the credibility of the witnesses, the weight to be given to their testimony, and the inferences to be drawn from the evidence. *People v. Galvin*, 127 Ill. 2d 153, 163 (1989). Accordingly, the trial court's ruling on a motion to suppress generally will not be overturned unless it is manifestly erroneous. *Galvin*, 127 Ill. 2d at 162; *People v. Evans*, 125 Ill. 2d 50, 78 (1988). "Manifestly erroneous means arbitrary, unreasonable and not based on the evidence." *People v. Wells*, 182 Ill. 2d 471, 481 (1998). However, *de novo* review is appropriate when neither the facts nor the credibility of witnesses is

questioned. *People v. Williams*, 181 Ill. 2d 297, 309 (1998).

Defendant argues that we should review this contention *de novo* because the facts are undisputed. We disagree. This contention turns on the credibility of witnesses. Therefore, we must review this contention based on the manifest error standard. See *Williams*, 181 Ill. 2d at 309.

Evidence at the suppression hearing adduced the following facts. On November 5, 1997, a Hanover Park police officer charged defendant in a criminal complaint, which was reviewed by a prosecutor, with possession of a stolen motor vehicle. Based on this charge, a warrant was issued for defendant's arrest. It was stipulated that at approximately 8:15 p.m. on Friday, November 7, 1997, Broadview police officers arrested defendant based upon the warrant for unlawful possession of a stolen motor vehicle. Defendant was taken to the Broadview police department. No Broadview police officer questioned defendant on any matter.

Detective Dossey testified as follows. He was the lead detective in the investigation. He was assigned to the case on November 4, 1997, the night that Noland's body was found. On November 7, shortly after 8 p.m., Detective Dossey was at home when he received a telephone call from Detective Piacenza regarding defendant. Detective Dossey went to the police station, where he met with Detective Piacenza, other investigators assigned to the case, and Assistant State's Attorney Diamond. Detective Dossey was informed that defendant was in custody in Broadview. He and Detective Piacenza were instructed to go to the Broadview police department and return with defendant.

Detectives Dossey and Piacenza went to the Broadview police department, arriving at approximately 9 p.m. They were taken to defendant. Detective Dossey intro-

duced himself and Detective Piacenza as detectives with the Hanover Park police department. According to Detective Dossey, defendant immediately stated that he was "glad it was over" and that he was "tired of running." Detective Dossey told defendant that they would talk later at the Hanover Park police station.

During the drive back to Hanover Park, the detectives did not question defendant, and defendant did not indicate that he wanted an attorney or wished to remain silent. Initially, there was no conversation at all. Eventually, defendant again volunteered comments such as he "was glad it was over," he "was tired of running," and he "was tired of looking over his shoulder all the time."

By 9:45 p.m. Detectives Dossey and Piacenza had returned with defendant to the Hanover Park police station. The detectives placed him in a room to conduct an interview. At approximately 9:50 p.m., Detective Dossey gave defendant *Miranda* warnings, reading verbatim from a preprinted *Miranda* warning and waiver form. Defendant indicated that he understood his rights and signed the form. Detective Dossey then asked defendant if he would be willing to talk with him and Detective Piacenza. According to Detective Dossey, defendant responded that "he would tell us everything."

Detective Dossey "then basically just asked [defendant] what happened." Defendant then related the events of October 29, 1997. The interview was essentially defendant's narrative, which the detectives interrupted only to ask questions for clarification. Defendant was calm and very cooperative. Defendant also told the detectives that he was not under the influence of drugs or alcohol.

At approximately 10:20 p.m., defendant requested and received a cigarette, which he smoked during the interview. At 10:30 p.m., food arrived for defendant. They relocated to another room. The three of them ate and

engaged in "casual, small talk" having nothing to do with the case.

After their meal, Detective Dossey asked defendant if he would be willing to speak with Assistant State's Attorney Diamond. Detective Dossey explained that Diamond was a prosecutor and not a defense lawyer. Defendant responded that he would talk with Diamond.

The interview resumed. At approximately 12:15 a.m. on November 8, Detective Dossey left the interview room to get Diamond. At approximately 12:26 a.m. Detective Dossey returned to the room. Diamond was already there with defendant and Detective Piacenza. Diamond explained to defendant that he was not his attorney. Defendant responded that he understood the prosecutor's role. Diamond then reviewed with defendant the signed *Miranda* form, confirming defendant's understanding of his rights.

Diamond proceeded to take an oral statement from defendant, which concluded at approximately 1:30 a.m. During the oral statement, defendant indicated that he knew what he had done was wrong and that he should die for it. Diamond then asked defendant if he would be willing to put his statement in writing; defendant responded in the affirmative. Defendant dictated his statement to Diamond, who transcribed defendant's words. During this time, defendant was allowed to use the restroom. Defendant then reviewed the written statement. Defendant indicated to Diamond portions of the statement that were inaccurate and told Diamond exactly what he wanted to say. Diamond then rewrote those sections according to defendant's instructions. Defendant then signed his written statement. The written statement concluded at 4:30 a.m.

The detectives believed that they could go no further until daylight, when they could search for physical evidence that defendant threw away. Defendant was

placed in a cell and allowed to sleep. The detectives agreed to meet back at the station later Saturday morning.

At approximately 10:30 a.m., defendant was given breakfast. Detectives Dossey and Piacenza read defendant his rights from a preprinted *Miranda* warning and waiver form, which he signed. As he ate breakfast, defendant stated that he remembered what he had done with the hammer and some of the other items that the investigators sought. Defendant volunteered to take the investigators to where the items were located. Defendant was allowed to take a shower.

At approximately 1:10 p.m., defendant, Detectives Dossey and Piacenza, and Assistant State's Attorney Diamond drove to Broadview. Defendant led them to where he had dumped some of the evidence. They stopped for lunch. They returned to the police station at approximately 3 p.m. At his request, defendant was allowed to use the restroom. Defendant then voluntarily assisted the investigators in identifying items recovered from Noland's car.

At approximately 4 p.m., Detective Dossey asked defendant if he would be willing to make a videotaped statement at the crime scene; defendant responded that he would. Defendant, the detectives, and the assistant State's Attorney again left the station. While en route to the crime scene, defendant offered to show them some houses that he had burglarized. Defendant made a videotaped statement at the crime scene. At the conclusion of the video, Diamond again reviewed the *Miranda* warning with defendant.

They returned to the police station at approximately 4:43 p.m. Waiting for them were law enforcement officers from two other jurisdictions. They wanted to speak with defendant regarding some burglaries that occurred in their communities. Detective Dossey advised defendant

that he did not have to talk with those officers. However, defendant stated that he wanted to talk with them to make sure that stolen property was returned to the proper people.

Sometime after 4 p.m., a criminal complaint charging defendant with first degree murder was prepared, and Detective Dossey served defendant. At that point, the officers had completed their investigation and no longer attempted to elicit any statements from defendant. According to Detective Dossey, in the course of defendant's interview, from approximately 9:50 p.m. on Friday, November 7, 1997, through approximately 4 p.m. on Saturday, November 8, defendant "continually divulged information regarding the investigation." Detective Dossey did not know of any press release from the Du Page County State's Attorney issued earlier Saturday afternoon.

Du Page County Assistant State's Attorney Diamond testified as follows. On the night of November 4, 1997, Diamond and several other assistant State's Attorneys were called to the crime scene to offer legal assistance to the Hanover Park police department. That night, Diamond first became aware that defendant was being investigated for Noland's murder. From that evening until the evening of November 8, he offered legal and other assistance to the Hanover Park police department during the course of its investigation.

On the evening of Friday, November 7, Diamond was at the Hanover Park police station. He and the police investigators assigned to the case were informed that defendant was in custody in Broadview. He accompanied the investigators to Broadview. Detectives Dossey and Piacenza were in one car and Diamond and another officer were in another. If defendant had remained with the Broadview police department, Diamond likewise would have remained there to assist those officers. He

returned with the Hanover Park investigators, with defendant riding with Detectives Dossey and Piacenza.

At the Hanover Park police station, Diamond waited to learn what defendant had told the detectives. He did not speak to anyone at the State's Attorney's office during this time. At approximately 12:26 a.m. he entered the room where defendant was being interviewed and did not leave it until 4:30 a.m. He remained at the police station for about an hour thereafter and then drove home.

At 6 a.m., Diamond telephoned his supervisor, Michael Wolfe. Diamond informed Wolfe that defendant gave a written statement admitting his involvement in the murder, and Diamond related the details of that statement to Wolfe. Diamond also told Wolfe that investigators hoped to recover the murder weapon and would attempt to corroborate the burglaries to which defendant had confessed. Wolfe did not give Diamond any explicit instructions regarding defendant's charge. Rather, the timing of the charge was left up to Diamond when he thought the investigation was complete. Wolfe took information from Diamond for the purpose of preparing a press release, which the office does in all murder cases. Diamond had nothing to do with preparing the release.

According to Diamond, when he, the detectives, and defendant returned from videotaping defendant's statement at the crime scene, "I had determined at that point that we had pretty much dotted all of our I's and crossed all of our T's and the investigation was as tight at that point as it needed to be." Diamond then approved the murder charge against defendant.

The testimony of Wolfe, Du Page County State's Attorney Joseph Birkett, and First Assistant State's Attorney John Kinsella was presented by stipulation. The parties stipulated that if Wolfe were called to testify, he would testify as follows. He received a telephone call

from Diamond in the early morning of Saturday, November 8, 1997. It was only during that telephone conversation that Wolfe actually authorized Diamond to charge defendant. They further discussed when charging would occur and whether additional evidence, specifically the videotaped crime scene statement, would be sought. Very soon after Wolfe's conversation with Diamond, Wolfe telephoned State's Attorney Birkett and informed him of the status of the case and related the conversation with Diamond. Birkett agreed to charge defendant with murder and to hold a press conference later that afternoon.

According to the stipulation of State's Attorney Birkett, he received a telephone call from Wolfe in the early morning on Saturday, November 8, 1997. Wolfe informed Birkett of the status of the investigation, and Birkett approved the decision to charge defendant with first degree murder. They also discussed the content and scheduling of a press conference later that afternoon. Birkett then had a telephone conversation with his first assistant, John Kinsella, in which they discussed the press conference.

Laura Pollastrini, the public information manager at the Du Page County State's Attorney's office, testified as follows. At approximately 9:30 a.m. on Saturday, November 8, 1997, Pollastrini received a telephone call from Kinsella informing her that the office would conduct a press conference that day. She received information from Wolfe and completed the press release at approximately 1 p.m. She showed it to the State's Attorney, who approved it. Sometime shortly after 1 p.m. the press release issued to the media and was read at the press conference.

The press release stated: "Joe Birkett, State's Attorney of Du Page County *** announced today that First Degree Murder charges *have been filed this afternoon* against Mark C. Ballard, 37, of 5712 Bedford Court,

Hanover Park. He is charged in connection with the death of Patricia A. Noland, 43, of that same address." (Emphasis added.) In his stipulation, Birkett conceded that the press release erroneously stated that charges had been filed that afternoon. In fact, charges had not yet been filed. According to Birkett, the press release should have indicated that first degree murder charges against defendant were expected to be filed that afternoon.

Defendant was presented to a Du Page County judge on Sunday morning, November 9, 1997; a criminal complaint charging defendant with first degree murder was filed.

A. *Sixth Amendment Right to Counsel*

Prior to trial, defendant filed a motion to suppress alleging that the State intentionally delayed bringing him before a judge to prevent attachment of his right to counsel under the sixth amendment to the United States Constitution (U.S. Const., amends. VI, XIV) and article I, section 8, of the Illinois Constitution (Ill. Const. 1970, art. I, § 8). In his motion, defendant claimed that his right to counsel attached when the State had committed itself to prosecute him "at least as early as the issuance of the press release, and perhaps earlier." Defendant sought suppression of any statements that he made subsequent to the attachment of his right to counsel. The trial court denied this motion.

Before this court, defendant focuses his claim. He relies solely on the sixth amendment. He alleges specifically that the State's "commitment to prosecute was made in the early morning hours of Saturday, November 8, but the filing of charges was intentionally delayed." Accordingly, defendant now claims that only the video-taped statement that he gave on the afternoon of November 8, 1997, should have been suppressed. Defendant seeks a new trial.

The controlling principles are established. The sixth amendment, applicable to the states through the fourteenth amendment, guarantees in relevant part: "In all criminal prosecutions, the accused shall enjoy the right *** to have the Assistance of Counsel for his defense." U.S. Const., amends. VI, XIV. The purpose of the sixth amendment is to assure that, in any criminal prosecution, the accused shall not be left to his or her own devices in facing the prosecutorial forces of organized society. "By its very terms, it becomes applicable only when the government's role shifts from investigation to accusation. For it is only then that the assistance of one versed in the 'intricacies ... of law' [citation] is needed to assure that the prosecution's case encounters 'the crucible of meaningful adversarial testing.' " [Citation.] *Moran v. Burbine*, 475 U.S. 412, 430, 89 L. Ed. 2d 410, 427, 106 S. Ct. 1135, 1146 (1986).

The sixth amendment right to counsel attaches at or after the initiation of adversarial judicial proceedings— whether by way of a formal charge, preliminary hearing, indictment, information, or arraignment. *United States v. Gouveia*, 467 U.S. 180, 187-88, 81 L. Ed. 2d 146, 153-54, 104 S. Ct. 2292, 2297 (1984), quoting *Kirby v. Illinois*, 406 U.S. 682, 688-89, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1881-82 (1972) (plurality opinion). In *Gouveia*, the Court explained:

> "Thus, given the plain language of the Amendment and its purpose of protecting the unaided layman at critical confrontations with his adversary, our conclusion that the right to counsel attaches at the initiation of adversary judicial criminal proceedings 'is far from a mere formalism.' [Citation.] It is only at that time 'that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural

criminal law.' [Citation.]" *Gouveia*, 467 U.S. at 189, 81 L. Ed. 2d at 155, 104 S. Ct. at 2298.

As the plurality in *Kirby* concluded: "It is this point, therefore, that marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable." *Kirby*, 406 U.S. at 690, 32 L. Ed. 2d at 418, 92 S. Ct. at 1882.

In this case, when defendant gave his videotaped statement on the afternoon of November 8, 1997, there had been no formal charging proceeding, preliminary hearing, indictment, information, or arraignment accusing defendant of murder. It has never been held that an arrest, by itself, triggers the sixth amendment right to counsel. *Gouveia*, 467 U.S. at 190, 81 L. Ed. 2d at 155, 104 S. Ct. at 2298, cited in *People v. Wilson*, 116 Ill. 2d 29, 50 (1987). Here, the fact that an arrest warrant was obtained prior to defendant's arrest was not sufficient to create trial-like confrontation contemplated by the sixth amendment. See *People v. Hayes*, 139 Ill. 2d 89, 126 (1990), citing *People v. Boswell*, 132 Ill. App. 3d 52, 59-60 (1985) ("Where the extent of the prosecutor's involvement in the procurement of the warrant is no more than in the assistance and preparation of the complaint *** the arrest must be characterized as purely investigatory without any commitment by the State at this point to pursue prosecution").

Further, custodial interrogation, by itself, does not trigger the sixth amendment right to counsel. *Moran*, 475 U.S. at 431-32, 89 L. Ed. 2d at 427-28, 106 S. Ct. at 1146; *People v. Evans*, 125 Ill. 2d 50, 79 (1988). These sixth amendment principles apply even if the investigation has focused on or targeted the defendant. *United States v. Hayes*, 231 F.3d 663, 674 (9th Cir. 2000); *State v. Register*, 323 S.C. 471, 477, 476 S.E.2d 153, 157 (1996); *State v. McCormick*, 778 S.W.2d 48, 53 (Tenn. 1989).

However, this court has held that "the level of prosecutorial involvement may be considered in determining

whether a defendant's sixth amendment right to counsel has attached." *People v. Garrett*, 179 Ill. 2d 239, 248 (1997) (collecting cases). In this case, therefore, "defendant has a sixth amendment right to counsel only if there has been significant prosecutorial involvement at the time of the questioned action or if the government has committed itself at that time to prosecute defendant." *Garrett*, 179 Ill. 2d at 250. Accordingly, our inquiry is into the degree of prosecutorial involvement at the time of the videotaped crime scene statement.

In this case, prior to or at the time of defendant's videotaped crime scene statement, there was not such a constitutionally significant degree of prosecutorial involvement as to trigger defendant's sixth amendment right to counsel. Diamond's initial involvement in the case was solely to assist law enforcement officers in their investigation. Diamond's role was one of investigation and not accusation. Indeed, it was not until Diamond spoke with Wolfe on the morning of November 8, 1997, that Diamond actually received from Wolfe the authority to charge defendant.

Further, *having the authority* to charge defendant is not the same as *deciding* to charge him. Diamond was authorized to charge defendant when Diamond believed that the investigation was complete. Wolfe never instructed Diamond to charge defendant at a particular time.

Defendant contends that "[t]he press release is one of the totality of the circumstances that demonstrates that the charging decision had been made in the early morning hours of November 8." According to defendant, the press release "is significant evidence that the decision had been made and paperwork was deliberately delayed while the police succeeded in getting a videotaped statement at the scene of the crime, and a tour of houses [defendant] had burglarized."

We disagree. Although the press release supports defendant's contention, it is only one of the many factors considered and is not conclusive. The press release should have announced that charges were expected to be filed against defendant. We agree with the State that, in the course of a criminal investigation, there likely exists an *expectation* that charges will be filed pending its conclusion. However, this does not mean that whenever the police or prosecutors investigate criminal activity and announce that charges are expected to be filed "the government has committed itself at that time to prosecute defendant." See *Garrett*, 179 Ill. 2d at 250.

Defendant protests that "[t]here was no investigation that needed to be done to get sufficient evidence to charge [him]," and that "further investigation could yield little that would be relevant to the charging decision." Describing this argument as "novel and paradoxical," the United States Supreme Court rejected it as follows:

> "There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction." *Hoffa v. United States*, 385 U.S. 293, 310, 17 L. Ed. 2d 374, 386, 87 S. Ct. 408, 417 (1966).

In this case, the investigators did not violate defendant's sixth amendment right to counsel by failing to cease their ongoing investigation. See, *e.g.*, *United States v. Craig*, 573 F.2d 455, 475 (7th Cir. 1977).

The trial court heard the testimony of Diamond, as well as that of Detective Dossey and Pollastrini. The court observed their demeanor and assessed their credibility. Based on their testimony and the other evidence,

the court found that prosecutors did not intentionally and unreasonably delay charging defendant in order to deny him his sixth amendment right to counsel. Rather, the court found that police and prosecutors wanted to continue their ongoing investigation. We cannot say that the trial court's finding was manifestly erroneous.

### B. *Presentment*

Defendant filed two additional pretrial motions to suppress, alleging violations of sections 109—1(a) and 109—2(a), respectively, of the Code of Criminal Procedure of 1963 (725 ILCS 5/109—1(a), 109—2(a) (West 1996)). Section 109—1(a) requires in pertinent part that "[a] person arrested with or without a warrant shall be taken without unnecessary delay before the nearest and most accessible judge in that county ***." 725 ILCS 5/109—1(a) (West 1996). In his motion, defendant claimed that the State violated section 109—1(a) by presenting him before a judge approximately 36 hours subsequent to his arrest. Defendant sought suppression of "[a]ll statements made by [him] after the time he should have appeared before a judge."

Section 109—2(a) requires in pertinent part:

"Any person arrested in a county other than the one in which a warrant for his arrest was issued shall be taken without unnecessary delay before the nearest and most accessible judge in the county where the arrest was made or, if no additional delay is created, before the nearest and most accessible judge in the county from which the warrant was issued." 725 ILCS 5/109—2(a) (West 1996).

In his motion, defendant noted that he was arrested at approximately 8:15 p.m. on Friday, November 7, 1997, in Broadview, which is located in Cook County. Defendant also submitted affidavit evidence that bond court in Cook County was in session that night from 6:30 to 10:45 p.m. in Chicago and on the following morning from approximately 9 to 10 a.m. in Maywood. Defendant claimed that the State violated section 109—2(a) by not present-

ing him to a Cook County judge, rather than to a judge in Du Page County, where he was ultimately taken. Defendant sought suppression of "[a]ll statements made by [him] after the time he should have appeared" before a Cook County judge.

The trial court denied these motions. Before this court, defendant seeks a new trial.

The committee comments to article 109 of the Code succinctly identifies the practical concern:

> "The most tedious and perplexing problem in the area is what happens between arrest and taking before a [judge] for a judicial hearing on probable cause. In practice, the time between arrest and hearing is that in which police officers question the accused and obtain, if possible, a confession. If the case is weak, there is a tendency to delay. If a confession is obtained during such delay, should it be admissible in evidence at the trial?
>
> Illinois continues to look at the confession cases solely in the light of the voluntary-involuntary test." 725 ILCS Ann., art. 109, Committee Comments—1963, at 3 (Smith-Hurd 1992).

Article 109 was drafted to assure an accused all necessary rights inherent in a preliminary examination and, at the same time, to continue Illinois statutory and case law pertaining to the time within which the accused must be presented to a judge for such hearing. 725 ILCS Ann., art. 109, Committee Comments—1963, at 3 (Smith-Hurd 1992).

Although section 109—1(a) of the Code (725 ILCS 5/109—1(a) (West 1996)) requires that an arrestee be presented to a judge "without unnecessary delay," noncompliance therewith does not, by itself, obviate a confession or render an otherwise voluntary confession inadmissible at trial. Rather, such delay is merely a factor to be considered on the question of voluntariness. *People v. House*, 141 Ill. 2d 323, 380 (1990); *People v. Brooks*, 51 Ill. 2d 156, 164-65 (1972). This is also true for

a violation of section 109—2(a). *People v. Pittman*, 55 Ill. 2d 39, 56-57 (1973).

The test of voluntariness is whether the defendant made the statement freely, voluntarily and without compulsion or inducement, or whether the defendant's will was overcome at the time he or she confessed. A determination of voluntariness requires consideration of the totality of the circumstances of each case. Factors to consider when determining voluntariness include: the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the duration of the questioning; whether defendant was advised of his constitutional rights; and whether defendant was subjected to any physical or mental abuse. The question of the competency of a confession is for the trial court alone to decide by a preponderance of the evidence, and its determination will not be disturbed on review unless it is against the manifest weight of the evidence. *People v. Gilliam*, 172 Ill. 2d 484, 500-01 (1996); *House*, 141 Ill. 2d at 376.

In the trial court, defendant expressly clarified that he was not claiming any police coercion or duress that caused him to involuntarily make the statements. Rather, defendant claimed solely an "unnecessary delay" in violation of sections 109—1(a) and 109—2(a). Accordingly, we turn to that factor of voluntariness.

While statutes such as sections 109—1(a) and 109—2(a) require presentment "without unnecessary delay," some latitude is allowed. Presentment to a judge need be performed only with such reasonable promptness as the circumstances permit. Whether there was or was not unnecessary delay must be determined from all the facts and circumstances of each case. *People v. Jackson*, 23 Ill. 2d 274, 278 (1961). Although "no arbitrary rule may be judicially fixed" (*Jackson*, 23 Ill. 2d at 278), Illinois deci-

sions suggest a delay of 24 to 36 hours prior to present-ment is usually not considered to be unnecessary. *People v. Shannon*, 149 Ill. App. 3d 525, 530 (1986); *People v. Martin*, 121 Ill. App. 3d 196, 208 (1984) (collecting cases).

Further, once a defendant in lawful custody has knowingly waived his or her *Miranda* rights and indicated a willingness to talk to police, section 109—1(a) does not obligate police to interrupt their interrogation as long as its length is not unreasonable and the defendant's statements continue to be voluntary. The "delay" involved in taking a voluntary statement from a defendant under these circumstances is "necessary" within the meaning of section 109—1(a). See *People v. Groves*, 294 Ill. App. 3d 570, 578 (1998); *People v. Smith*, 203 Ill. App. 3d 545, 563 (1990). The legislative directions that an accused be presented to a judge " 'without unnecessary delay' " "cannot mean that police officers must forsake all other duties to comply, and neither can they mean that the police do not have reasonable latitude to fully investigate a crime." *Jackson*, 23 Ill. 2d at 280; accord *House*, 141 Ill. 2d at 380. These principles apply to section 109—2(a) as well. See *Pittman*, 55 Ill. 2d at 56-57.

In this case, the trial court expressly considered all of the factors pertaining to the voluntariness of defendant's statements. Regarding the factor of delay, the court found: defendant willingly cooperated with police from the beginning of his interview; defendant's cooperation extended throughout his prearraignment detention; and the length of the interrogation was not unreasonable. After considering the evidence, the trial court concluded that defendant's statements were voluntary and denied his motions to suppress based on sections 109—1(a) and 109—2(a) of the Code of Criminal Procedure. The trial court's determination was not manifestly erroneous.

## II. Sufficiency of Mitigation Evidence

Defendant claims that the trial court erred when it

found no mitigating factors sufficient to preclude the imposition of the sentence of death. Defendant contends that he was suffering from extreme emotional disturbance at the time of the crime; that he has significant rehabilitative potential; and that he has taken full responsibility for his actions. Defendant argues that one or all of these factors is sufficient mitigation to preclude the imposition of the death sentence. Defendant asks this court to vacate his death sentence and remand for a sentence other than death.

In determining whether a sentence of death is proper, we must consider "the character and record of the individual offender and the circumstances of the particular offense." *People v. Pitsonbarger*, 142 Ill. 2d 353, 388 (1990), citing *Woodson v. North Carolina*, 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991 (1976). "[E]ach capital case is unique and must be evaluated on its own facts, focusing on whether the circumstances of the crime and the character of the defendant are such that the deterrent and retributive functions of the ultimate sanction will be served by imposing the death penalty." *People v. Johnson*, 128 Ill. 2d 253, 280 (1989). "A death sentence is appropriate if the sentence is commensurate with the seriousness of the offenses and gives adequate consideration to relevant mitigating circumstances." *Pitsonbarger*, 142 Ill. 2d at 388. After careful consideration of the circumstances of the crime in this case and the character of defendant, we agree with the trial court that there are no sufficient mitigating factors to preclude the imposition of the death penalty and find no error.

The defendant presented the following evidence in mitigation. Six family members, consisting of defendant's sister, stepsister, aunt, cousin, great-aunt, and a cousin of defendant's biological mother, related that defendant had been raised by his mother and stepfather. Defendant's

stepfather brought three of his own children into the marriage and adopted defendant and defendant's sister. Soon after their marriage, defendant's mother and stepfather had two children. Furthermore, these witnesses stated that incidents of physical abuse towards defendant and his siblings while defendant lived with his mother and stepfather were heard of and/or witnessed. Defendant's stepsister testified that there was a lot of rage, violence, and anger in the household and defendant's cousin stated that it was "like hell" when he lived in the Ballard home for a time. In addition, on a number of occasions not only did defendant run away from home but five of his siblings ran away, with three never to return. Furthermore, defendant's aunt, cousin, and the cousin of defendant's biological mom stated that defendant's stepfather was very distrustful and a con artist. The witnesses testified that defendant was always respectful, obedient, and did anything asked of him.

Defendant's ex-wife, Susan Ballard, testified that she was married to defendant for 10 years and still maintains regular contact with him while he is in jail. Throughout their marriage, defendant would periodically discuss with Susan the physical abuse he suffered as a child at the hands of his stepfather. Susan described defendant's mother and stepfather as domineering and controlling. In addition, Susan stated that she was aware of defendant's drug and alcohol dependencies during their marriage and that when defendant was on drugs and alcohol, he was violent, argumentative, and not nice to be around. But when defendant was clean and sober, he was very helpful, pleasant, and loving. Susan also told of incidents where defendant had physically assaulted her and stole from her. Furthermore, Susan testified that she met with defendant a few days after he had murdered Noland and that defendant was crying when he told her that he had killed someone.

A minister who counseled defendant 10 or so times in the past six to eight years prior to Noland's murder testified that he thought defendant was unstable and needed help.

Eight individuals, including a clinical social worker, minister, and a jail chaplain, who volunteer their time supervising various classes and helping inmates with their issues at the jail testified on behalf of defendant. Defendant participated in the following classes: Men's Issues Group; AA; Bible Study; Anger Management, Relapse Management, and Addiction Education; Healing Our Losses, Job Readiness, and Commitment to Change; and Parenting. Those eight individuals collectively thought that defendant was an active member in class and was well liked by others. Defendant brought other inmates to the classes, and some considered him their mentor. One inmate testified that he met defendant in one of the classes above and felt that defendant played an outstanding role in his recovery. In addition, the volunteers who supervise these classes stated that defendant was sincere, honest, and always searching for answers. Furthermore, defendant admitted in class to killing Noland and discussed his feelings of remorse and guilt. The minister specifically believed that defendant has accepted reality and understands the choices he has made.

Dr. Albert Stipes, a forensic psychiatrist, testified as a mitigation witness. Dr. Stipes evaluated defendant and based on his review, found that defendant suffers from Bipolar II disorder. Bipolar II is a disorder of the mood. There are many types of bipolar disorders, but they are all characterized by extremes of mood, *i.e.*, elated moods, depressed moods, and sometimes delusions and hallucinations accompany one of these. Additionally, Dr. Stipes noted that defendant suffered from alcohol and cocaine dependency and that, sometimes, people with bipolar

disorder use substances to control their own symptoms. For example, people use cocaine when they are feeling depressed and alcohol when feeling agitated. Furthermore, Dr. Stipes stated that cocaine has a very short life and when put into someone with Bipolar II disorder can promote rapid cycling—frequent changes from depression to elation or agitation. Dr. Stipes concluded that defendant was suffering from Bipolar II disorder when defendant, as discussed later herein, assaulted fellow inmates and when he killed Noland.

Defendant testified on his own behalf as a mitigation witness. Defendant related his past physical abuse at the hands of his stepfather and the number of times he ran away. Defendant stated that he started drinking alcohol when he was nine years old and started using cocaine when he was 18. Defendant admitted to committing over a hundred burglaries in order to fund his drug and alcohol habits. Defendant testified that anytime the police caught him, he would readily confess. Being in and out of jail his whole life, there were times when defendant tried to clean himself up, but would ultimately revert back to drugs and alcohol.

On the morning of Noland's murder, defendant was 37 years old and was on one of his drug binges. That day, defendant smoked cocaine from approximately 2 to 8 p.m. and wanted some more, which is when Noland came to his mind. Initially, defendant only intended to rob Noland, but thinking that she would later identify him, his thoughts turned to murder. Defendant wrestled with the idea of whether or not to kill Noland for over an hour and decided that he was not going to kill her, but essentially snapped when Noland left his soda in her car. Defendant stated that at one point he had wanted to stop hitting Noland with the hammer, but knew that if he had stopped, she would probably be a vegetable for the rest of her life. Defendant believed that what he had done was

horrible and readily admitted that he deserved to die as a consequence. Defendant further admitted that at the time of his arrest, he felt relieved to be away from drugs and ashamed and irritated at himself for what he had done and unmindful if he lived or died. Defendant testified that he now cares and wishes to live.

Furthermore, while in jail, defendant attended the classes mentioned above, actively sought psychiatric help because he thought he had a chemical imbalance, and put God into his life. Defendant began taking medication for his psychological problem in December of 1997.

In addition, defendant told the court that he physically assaulted fellow inmates because (1) the first inmate slammed a mentally ill person against the wall, (2) the second inmate was homosexual and had made a pass at him, and (3) a third inmate was calling him names.

In contrast to this mitigating evidence, the State presented the following evidence in aggravation. The State introduced all of the evidence produced at trial regarding Noland's murder, including a videotape of defendant walking through the murder scene and defendant's oral and written confessions. In addition, evidence of defendant's extensive criminal record was admitted, which included convictions for: aggravated battery; battery; burglary; residential burglary; attempted residential burglary; criminal trespass; theft; assault; and violation of a court order. It appears defendant has been in and out of jail since his early 20s.

Further evidence of defendant's background was presented through a number of witnesses, the majority of which are as follows. The State presented defendant's stepfather, stepbrother, half sister, and a family friend; all of whom stated that there was no abuse in the family while defendant was growing up and, in particular, that defendant was not abused as a child by his stepfather.

Colonel Steve Connolly, from the United States Army

Reserve, testified that defendant joined the army in 1978 and received a counseling statement within three weeks of his arrival. In the army, a counseling statement is received for some type of misconduct. Defendant's counseling statement stated that defendant was "unmotivated, lacked self-discipline, won't cooperate with his peers in doing his share of the work and will not perform without direct supervision." In addition, defendant received two "Field Grade Article 15s." An Article 15 gives a commander an option to impose a sentence for a criminal violation instead of sending a matter to court. A Field Grade Article 15 has a more severe sentencing option than an Article 15 because it is for a higher ranking officer who has greater authority to impose a more significant sentence. Defendant's first Field Grade Article 15 pertained to an incident where defendant unlawfully hit another soldier in the wrist and body with a broomstick. The second pertained to defendant intimidating and threatening witnesses to a third party's court martial. In the end, defendant received an honorable discharge from the army after being reviewed and for receiving the two Field Grade Article 15s.

Six witnesses, including defendant's biological father and ex-brother-in-law, testified that their homes were burglarized by defendant. In 1981, defendant's biological father came home from vacation to find that his home had been burglarized. A year later, defendant told his biological father that he committed the burglary and that he sold the stolen items.

In addition, 12 police officers testified in relation to the above burglaries and other burglaries committed by defendant that they were investigating. Officer Carlton Perry of the Bartlett police department stated that he was investigating a burglary on September 28, 1981, to a home belonging to defendant's biological father. That on that same date, he interviewed defendant and defendant admitted to burglarizing his biological father's home.

Also, Officers Mike Gartner and Robert Christ of the Elgin police department testified that on August 8, 1981, they responded to a break-in at a local bar. Officer Gartner found defendant in the basement and defendant was subsequently charged with burglary.

In December 1983, Kenneth Piletic testified that he was home sleeping when he heard his doorbell ringing. Upon going downstairs, Piletic saw a shadow of a figure go around his house so he went to the back of his home to look through a window. By the time Piletic reached his back door, the window in the door was broken and someone was trying to get in. Piletic called the police, who apprehended defendant in Piletic's neighbor's yard. Defendant received a nine-year sentence for attempted residential burglary of Piletic's home.

Detective Norman Landwehr of the Elgin police department testified that on January 18, 1984, defendant confessed to committing 41 burglaries and was subsequently charged for a number of them. Defendant also told Detective Landwehr that he had a severe drug problem and that he committed the burglaries to purchase drugs.

Lieutenant Steve Schinkel of the Algonquin police department testified that on January 21, 1984, defendant admitted to committing well over a hundred burglaries within the last year, some within Algonquin. After the interview, defendant was charged with residential burglary. In addition, defendant told Lieutenant Schinkel that he wanted to confess everything so that he could start his life over when he got out of prison.

Sergeant Randy Johnson of the North Aurora police department testified that on January 26, 1984, defendant confessed that on December 13, 1983, he had stolen a television and traded it for cocaine in Elgin.

In November 1997, Officer Shawn Talluto of the West Frankfort police department responded to a call made by

defendant's grandmother on November 6, 1997. Defendant's grandmother told Officer Talluto that defendant had been at her home and had tried kicking in her door, demanding to be let in. After refusing to let defendant in, she called the police. Scared for her safety, she spent the night with a friend. The next day, Officer William Troutt, also of the West Frankfort police department, met defendant's grandmother and she asked Officer Troutt to search her home before she went back in to make sure defendant was not there. In addition, both officers responded to and investigated burglaries in the area.

Detective Sergeant Bruce McVety of the Bureau County sheriff's department stated that he interviewed defendant on November 8, 1997, with another officer at the Hanover Park police station. Defendant confessed to committing four burglaries. Detective McVety testified that defendant told him he committed the burglaries to buy cocaine and that he felt bad about committing the fourth burglary because the home belonged to his friends.

Detective Dossey testified that after discussing Noland's murder with defendant, he admitted to committing a number of burglaries in South Elgin, Princeton, and West Frankfort between the dates of November 4, 1997, and November 6, 1997. Furthermore, Detective Dossey stated that defendant told him that he had wished he had killed McGuire because McGuire was an "asshole and had a drug problem and would blame other people for things, and that he just didn't care for [McGuire]." Defendant stated that he was going to "chop [McGuire's] head off with an axe." At no time during Detective Dossey's interview did defendant say he was sorry for murdering Noland.

Detective Driskill testified that he searched Noland's car. There, he found items defendant had stolen from the homes he previously had burglarized.

In addition, four witnesses gave testimony relating to incidents where defendant physically assaulted them. The four police officers who took the reports of the physical assault incidents also testified and stated that all parties involved, with the exception of one, named defendant as the wrongdoer. One of these witnesses, Baldemar Santana, testified that on October 28, 1979, he was walking through a packed bar in Elgin when he heard someone yelling at him. Santana did not hear what was said. As he started to walk back to his seat, he was hit over the head with a beer bottle. Santana testified that he did not know the person who hit him and had never seen him before. Later, witnesses at the bar told him and police that defendant was the culprit. Another of these witnesses, Brenda Kusch, defendant's half sister, testified that on July 24, 1991, defendant picked her up by the ears, threw her to the ground, and hit her over the head with a beer bottle. Kusch reported the incident to police and filed a complaint against defendant for battery. Also, on August 23, 1991, defendant tried to break into Kusch's home.

Additionally, two inmates testified that defendant physically assaulted them while defendant was in jail awaiting trial for the murder of Noland. Eight officers and one registered nurse testified to their involvement pertaining to the two incidences in jail with one officer stating that he saw defendant fighting a third inmate on another occasion.

Dr. Jerry Wolfe, a psychologist, interviewed defendant after defendant's second physical assault on an inmate. Dr. Wolfe testified that defendant displayed no sense of remorse, regret, or apology for the assaults. He further stated that defendant had been on a number of different medications up to that point, which was unusual.

Lastly, the State presented victim impact testimony from five of Noland's family members.

Section 9—1(h) of the Illinois death penalty statute provides that "once the State has proved the existence of any of the aggravating factors [720 ILCS 5/9—1(b) (West 1996)], beyond a reasonable doubt [720 ILCS 5/9—1(f) (West 1996)], a *** court must weigh the mitigating factors against the aggravating factors and must conclude that no mitigating factors sufficiently preclude the imposition of the death sentence." *People v. Brownell*, 79 Ill. 2d 508, 534 (1980); 720 ILCS 5/9—1(h) (West 1996). A balancing process of the aggravation and mitigation evidence presented is required of the sentencing authority. *Brownell*, 79 Ill. 2d at 534. " 'While the various factors to be considered by the sentencing authorities do not have numerical weights assigned to them, *** the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.' " *Brownell*, 79 Ill. 2d at 534, quoting *Proffitt v. Florida*, 428 U.S. 242, 258, 49 L. Ed. 2d 913, 926, 96 S. Ct. 2960, 2969 (1976).

The trial court in this case considered the evidence that was presented, the testimony of the witnesses, their credibility, their believability on the stand, and the law that applies to cases involving whether the death penalty should or should not be imposed. In addition, the trial court considered the nature and circumstances of the offense; the history, character and condition of defendant; and whether or not defendant can be restored to useful citizenship.

As pertaining to defendant's mitigation evidence, the trial court considered defendant's childhood and upbringing; whether the murder was committed while defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to the prosecution; whether or not defendant may be

rehabilitated or restored to useful citizenship at some future point; and if there were any other reasons supported by the evidence in the record as to why defendant should not be sentenced to death. The trial court ultimately found that none of these matters were sufficient to preclude the imposition of the death sentence.

Defendant contends that the trial court erred in finding no sufficient mitigation to preclude the imposition of death. Specifically, defendant believes that he has significant rehabilitative potential, which he demonstrated by actively pursuing help in jail for his addictions, anger, and psychological problems. However, good behavior in prison need not offset otherwise substantial aggravating evidence against the defendant. See *People v. Emerson*, 189 Ill. 2d 436, 495 (2000); *People v. Madej*, 177 Ill. 2d 116, 162 (1997); *People v. Turner*, 156 Ill. 2d 354, 361 (1993) (" '[O]ne arrested for a capital crime, and particularly a convicted defendant awaiting sentencing, has every incentive to behave flawlessly in prison if good behavior might cause the sentencing authority to spare his life. Good behavior in those circumstances would rarely be predictive as to the conduct of the prisoner *after* sentence has been imposed' (emphasis in original)"), quoting *Skipper v. South Carolina*, 476 U.S. 1, 14-15, 90 L. Ed. 2d 1, 13, 106 S. Ct. 1669, 1676 (1986) (Powell, J., concurring, joined by Burger, C.J., and Rehnquist, J.).

Defendant also contends that his violent behavior in and out of prison was directly attributable to his drug and alcohol dependencies and bipolar disorder and that, because of these dependencies and disorder, defendant was under an extreme emotional disturbance at the time he murdered Noland and physically assaulted his fellow inmates. However, this court has recognized that "a history of substance abuse is a double-edged sword at the aggravation/mitigation phase of the penalty hearing."

*Madej*, 177 Ill. 2d at 138. " '[S]imply because the defendant views his drug abuse history as mitigating does not require the sentencer to do so.' " *Madej*, 177 Ill. 2d at 138, quoting *People v. Shatner*, 174 Ill. 2d 133, 159 (1996). Accordingly, the sentencing judge was free to conclude that defendant's dependencies and disorder were aggravating and simply had no mitigating value. Furthermore, with respect to the defendant's psychological disorder, this court has repeatedly held that " 'information about a defendant's mental or psychological impairments is not inherently mitigating.' " *Madej*, 177 Ill. 2d at 139, quoting *People v. Tenner*, 175 Ill. 2d 372, 382 (1997). This court explained in *Tenner*, "[a]t sentencing, a judge or jury considering evidence of this nature might view the information as either mitigating or aggravating, depending, of course, on whether the individual hearing the evidence finds that it evokes compassion or demonstrates possible future dangerousness.' " *Tenner*, 175 Ill. 2d at 382. "Even if we were to consider defendant's alleged psychological and neurological impairments as mitigating factors, '[m]itigation evidence of a defendant's cognitive abilities and mental health does not preclude imposition of a death sentence when that evidence is outweighed by aggravating evidence.' " *Madej*, 177 Ill. 2d at 139-40, quoting *People v. Pulliam*, 176 Ill. 2d 261, 286 (1997).

Similarly, the remainder of the evidence offered by defendant carries little, if any, weight in terms of mitigation. As to defendant's somewhat troubled childhood, the trial court in this case was free to conclude " 'that it simply had no mitigating value but may have been, in fact, actually aggravating.' " *Madej*, 177 Ill. 2d at 140, quoting *People v. Ward*, 154 Ill. 2d 272, 337 (1992). Moreover, " 'evidence that a defendant has been physically or sexually abused *** does not invalidate a death sentence when outweighed by aggravating evidence.' "

*Madej*, 177 Ill. 2d at 140, quoting *People v. Pulliam*, 176 Ill. 2d 261, 286 (1997). Further, we note that defendant never held a job for very long, often quitting as a result of his drug and alcohol dependencies or because of incarceration. It appears that for more than 20 years, defendant was either in jail or committing burglaries to fund his drug and alcohol habits. Finally, although defendant took full responsibility for his crime and may have showed some sense of remorse by saying "I deserve to die for what I did," which may be viewed as mitigating, we do not consider that evidence sufficiently offsetting in light of the aggravating circumstances in this case.

In view of the foregoing, we hold that the trial court considered and weighed all the evidence presented before it. In addition, we find that the evidence presented in aggravation and mitigation not to be closely balanced; therefore, we decline to grant defendant a new sentencing hearing.

III. Other-Crimes Witnesses: Improper Testimony

Defendant next argues that he is entitled to a new sentencing hearing because the trial court erred in allowing the State to present victim impact evidence from the victims of prior crimes. Specifically, defendant raises issue with two of the State's aggravation witnesses, Nicole Stieber and Lisa Trone. Trone's home was burglarized by defendant. Trone merely described what it was like entering her home on November 6, 1997, after it had been burglarized. Trone found the front door jarred open and saw large muddy footprints on her white carpet. Due to seeing exactly where the burglar had traveled throughout her home, Trone testified to having an eerie feeling.

Since defendant failed to object to Trone's testimony in his post-trial motion, as required by the Code of Criminal Procedure of 1963 (725 ILCS 5/116—1 (West 1996)), the State argues that defendant waived this issue

as it pertains to Trone. We agree. This court has stated the general rule that the failure to raise an issue in a written motion for a new trial results in a waiver of that issue on appeal. *People v. Enoch*, 122 Ill. 2d 176, 185-86 (1988). To preserve an issue on appeal, a defendant must object to the purported error at trial and include it in his written post-trial motion. *Enoch*, 122 Ill. 2d at 186. A defendant must follow this same procedure if he wishes to raise errors which occurred at sentencing or risk waiving them on appeal. *People v. Mahaffey*, 166 Ill. 2d 1, 27 (1995). In this case, defendant failed to raise Trone's testimony in his post-sentencing motion; therefore, defendant waived the issue. Defendant does not raise the issue of plain error and, as noted above, the aggravation evidence was overwhelming and not closely balanced. See *People v. Simpson*, 172 Ill. 2d 117, 147 (1996) (stating that the defendant did not raise the issue of plain error and noticing that the evidence at trial was overwhelming and not closely balanced).

We now turn to defendant's properly raised contention concerning Nicole Stieber's testimony. Stieber testified that she dated defendant in 1992 and that he bragged about previous burglaries he had committed. After four months of dating, Stieber tried to break the relationship off with defendant. Even though Stieber invoked restraining orders and orders of protection, defendant would always come back and break into her home. On August 26, 1992, defendant was drunk when he called Stieber at her home, and later that evening, defendant went to Stieber's house. Defendant yelled at Stieber and began hitting her with anything he could put his hands on, including a ceramic cup. During the assault, Stieber protected her face with her hands. Due to this incident, Stieber's right hand was severely damaged and remains crippled. Stieber further told the trial court that she underwent seven surgeries on her hand, gave details of

the procedures performed, and stated how the injury has affected her life. In addition, continuing therapy requires Stieber to wear a brace for six hours every night on her hand to help with mobility.

It is well established that "at the second stage of a capital sentencing hearing, the standard for admissibility of evidence is relevance and reliability, and that evaluation is left to the sound discretion of the trial judge." *People v. Hope*, 184 Ill. 2d 39, 51 (1998). Defendant contends that Stieber's detailed testimony concerning the aftereffects of defendant's offense was neither reliable nor relevant and that it is victim impact testimony that is barred by the Rights of Crime Victims and Witnesses Act (725 ILCS 120/1 *et seq.* (West 1996)). The State responds that Stieber's testimony was relevant and reliable and that the trial court's decision to admit the evidence was not an abuse of discretion. The State contends that Stieber's detailed account regarding the extent of her hand injury was relevant because it highlighted defendant's taste for violence. We disagree.

"While the details of prior crimes are considered relevant aggravation because they illuminate the character and record of a capital defendant [citation], the unforseen effects of those prior crimes on their victims are of no such assistance." *Hope*, 184 Ill. 2d at 52. In this case, Stieber testified to her encounters with defendant, which included the assault upon her and the injury resulting therefrom. However, upon further questioning by the State, Stieber went into detail concerning the unforseen consequences of the injury and its effect on her life. We find Stieber's detailed account regarding defendant's offense to be irrelevant victim impact testimony. However, we conclude the State's introduction of this victim impact evidence not to be so unduly prejudicial that it renders the capital sentencing hearing fundamentally unfair. At the second stage of the sentencing hear-

ing, the State presented evidence in aggravation, through 47 witnesses, of, *inter alia*, defendant's criminal background, his numerous burglaries and assaults, and his misconduct in prison. Stieber's impact testimony covered approximately four pages in the record. Considering the voluminous amount of aggravation evidence presented, we conclude that the State's error was harmless and not so egregious as to deprive defendant of a fair sentencing hearing. See, *e.g.*, *People v. Hall*, 195 Ill. 2d 1, 19 (2000) (significant evidence in aggravation compelled finding that, even if the brief answer given by the aggravation witness violated *Hope* rule, *supra*, such error was harmless beyond a reasonable doubt).

IV. Constitutionality of Death Penalty Statute

Defendant lastly contends that the Illinois death penalty statute (720 ILCS 5/9—1 (West 1996)) is unconstitutional for several reasons. Defendant asks us to vacate his death sentence and remand the cause for imposition of a sentence other than death.

A. *Excessive Number of Eligibility Factors*

Defendant claims that the Illinois death penalty statute has a constitutionally excessive number of statutory aggravating factors. Defendant argues that the statute is "unconstitutional because it fails to adequately limit the class of individuals eligible for the death penalty."

The constitutional principles are quite established. The eighth amendment death penalty jurisprudence of the United States Supreme Court addresses "two different aspects of the capital decisionmaking process: the eligibility decision and the selection decision." *Tuilaepa v. California*, 512 U.S. 967, 971, 129 L. Ed. 2d 750, 759, 114 S. Ct. 2630, 2634 (1994). The eighth amendment's concern that the death penalty be both appropriate and not randomly imposed requires a state to perform two

somewhat contradictory tasks to impose the death penalty. *Romano v. Oklahoma*, 512 U.S. 1, 6, 129 L. Ed. 2d 1, 9, 114 S. Ct. 2004, 2009 (1994).

First, a capital sentencing scheme must genuinely narrow the class of individuals eligible for the death penalty and must reasonably justify imposition of a more severe sentence on the defendant compared to others found guilty of murder. A state's sentencing procedure must suitably direct and limit the discretion of the sentencing body so as to minimize the risk of completely arbitrary and capricious action. *Romano*, 512 U.S. at 7, 129 L. Ed. 2d at 9, 114 S. Ct. at 2009, quoting *Zant v. Stephens*, 462 U.S. 862, 874, 77 L. Ed. 2d 235, 248, 103 S. Ct. 2733, 2741 (1983), quoting *Gregg v. Georgia*, 428 U.S. 153, 189, 49 L. Ed. 2d 859, 883, 96 S. Ct. 2909, 2932 (1976).

Accordingly, to render a defendant eligible for the death penalty, the trier of fact must first convict the defendant of murder and find one "aggravating circumstance" or its equivalent at either the guilt or the penalty phase of the trial. The aggravating circumstance may be contained in the definition of the crime, a separate sentencing factor, or both. The aggravating circumstance must meet two requirements. First, the circumstance must apply only to a subclass of defendants convicted of murder; it may not apply to every defendant convicted of a murder. Second, the aggravating circumstance may not be constitutionally vague. *Tuilaepa*, 512 U.S. at 971-72, 129 L. Ed. 2d at 759, 114 S. Ct. at 2634-35 (and cases cited therein).

Second, a state must ensure that a capital sentencing decision rests on an individualized inquiry, under which the character and record of the defendant and the circumstances of the particular offense are considered. A state cannot limit the sentencing body's consideration of any relevant circumstance that could cause it to decline

to impose the penalty. The state cannot channel the discretion of the sentencing body, but must allow it to consider any relevant information that the defendant offers. *Romano*, 512 U.S. at 7, 129 L. Ed. 2d at 10, 114 S. Ct. at 2009, quoting *McCleskey v. Kemp*, 481 U.S. 279, 306, 95 L. Ed. 2d 262, 287, 107 S. Ct. 1756, 1774 (1987).

Accordingly, this is a separate requirement for the selection decision, where the sentencing body determines whether a defendant who is eligible for the death penalty should receive that sentence. The requirement of an individualized determination is met when the sentencing body can consider all relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime. *Tuilaepa*, 512 U.S. at 972, 129 L. Ed. 2d at 759-60, 114 S. Ct. at 2635.

In sum: "The eligibility decision fits the crime within a defined classification. *** The selection decision, on the other hand, requires individualized sentencing and must be expansive enough to accommodate relevant mitigating evidence so as to assure an assessment of the defendant's culpability." *Tuilaepa*, 512 U.S. at 973, 129 L. Ed. 2d at 760, 114 S. Ct. at 2635.

Procedure under the Illinois death penalty statute is familiar. A death penalty hearing in Illinois consists of a two-stage process. During the first phase, it is determined whether a defendant is eligible for the death penalty. A defendant who has been found guilty of murder is eligible if: (1) he or she has obtained the age of 18; and (2) the jury has found the existence of at least one listed aggravating factor. 720 ILCS 5/9—1(b) (West 2000). The first phase is a nonweighing statutory scheme to determine death eligibility. The statute does not place special emphasis on any single aggravating factor and does not accord any added significance to multiple aggravating factors. *People v. Coleman*, 129 Ill. 2d 321, 344-45 (1989); *People v. Todd*, 154 Ill. 2d 57, 75 (1992). "So long as the

sentencing body has found at least one valid aggravating factor, the fact that it also may have considered an invalid aggravating factor does not infect the formal process of deciding whether death is an appropriate penalty." *Todd*, 154 Ill. 2d at 75. The aggravating factors distinguish and narrow the group of persons who are death eligible. In the absence of one of these limiting factors, the offense of murder qualifies the defendant for a term of imprisonment. *People v. Britz*, 123 Ill. 2d 446, 484 (1988).

If it is determined that the defendant is eligible for the death penalty, then, during the second phase of the death penalty hearing, the jury or court weighs any relevant aggravating and mitigating factors and determines whether there are any mitigating factors sufficient to preclude the imposition of the death penalty. 720 ILCS 5/9—1(c), (g), (h) (West 2000). Also, this court provides meaningful appellate review of every death sentence. 720 ILCS 5/9—1(i) (West 2000); *Coleman*, 129 Ill. 2d at 345; *Britz*, 123 Ill. 2d at 484.

Courts have consistently upheld the above-described procedure under the Illinois death penalty statute as constitutional. "It is this process, in conjunction with the requirement of proof beyond reasonable doubt of any aggravating factor, as well as mandatory review [citation], which sufficiently circumscribes the class or persons eligible for the death penalty." *People v. Williams*, 147 Ill. 2d 173, 267-68 (1991); accord *People v. Young*, 128 Ill. 2d 1, 64-65 (1989); *Britz*, 123 Ill. 2d at 484-85; *Williams v. Chrans*, 742 F. Supp. 472, 501 (N.D. Ill. 1990), *aff'd*, 945 F.2d 926 (7th Cir. 1991) ("In sum, the Illinois death penalty statute properly and clearly guides the sentencing jury to narrow the risk of arbitrariness without preventing the jury from considering and giving effect to any relevant mitigating circumstances")

However, over the years, the legislature has added to the list of aggravating factors in subsection (b) of the Il-

linois death penalty statute (720 ILCS 5/9—1(b) (West 2000)). When originally enacted in 1977, the statute listed seven aggravating factors. Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b). By 1981, the list had grown to eight. Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b). By 1989, the listed aggravating factors totaled 10. Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b). By 1991, the list contained 11 aggravating factors (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)), 12 aggravating factors by 1992 (720 ILCS 5/9—1(b) (West 1992)), 14 aggravating factors by 1994 (720 ILCS 5/9—1(b) (West 1994)), 15 aggravating factors by 1996 (720 ILCS 5/9—1(b) (West 1996)), 19 aggravating factors by 1998 (720 ILCS 5/9—1(b) (West 1998)), and 20 aggravating factors by 2000 (720 ILCS 5/9—1(b) (West 2000)).

Defendant contends that the death penalty statute is unconstitutional because it contains too many aggravating factors. Defendant argues:

"The number and breadth of these factors do not sufficiently narrow the class of persons eligible for the death penalty. Indeed, the high number of aggravating factors so greatly expands the class of death eligible defendants that it is difficult to imagine a first degree murder defendant who does not qualify under at least one, if not several factors."

According to defendant, this statutory sentencing scheme fails to genuinely narrow the class of persons eligible for the death penalty.

We cannot accept defendant's contention for at least two reasons. First, on a literal and practical level, defendant's contention is incorrect. Looking at the entire universe of first degree murders and murderers, the Illinois death penalty statute genuinely narrows the class of individuals eligible for the death penalty and reasonably justifies imposition of a more severe sentence on those defendants compared to others found guilty of first degree murder. See *Zant v. Stephens*, 462 U.S. 862, 877, 77 L. Ed. 2d 235, 249-50, 103 S. Ct. 2733, 2742 (1983).

Initially, the statute limits its application to persons older than 18 years of age. Persons younger than 18 can commit first degree murders yet will never be eligible for the death penalty.

Further, there are innumerable examples of first degree murders that do not fit within any of the statute's eligibility factors. Each provision is narrowly tailored to fit a specific set of facts and circumstances, *e.g.*, murder of an emergency medical technician or paramedic (720 ILCS 5/9—1(b)(12) (West 2000)), murder of a disabled person (720 ILCS 5/9—1(b)(17) (West 2000)), murder of a community policing volunteer (720 ILCS 5/9—1(b)(18) (West 2000)), or murder of a person subject to an order of protection (720 ILCS 5/9—1(b)(19) (West 2000)). Each provision genuinely narrows the class of persons who can be eligible for the death penalty. Further, the requirements of proof beyond a reasonable doubt of any aggravating factor and automatic appellate review direct and limit the discretion of the sentencing body so as to minimize the risk of completely arbitrary and capricious action. See *Romano*, 512 U.S. at 7, 129 L. Ed. 2d at 9, 114 S. Ct. at 2009; *McCleskey v. Kemp*, 481 U.S. 279, 302-03, 95 L. Ed. 2d 262, 285, 107 S. Ct. 1756, 1772-73 (1987).

A second reason for rejecting defendant's contention is more conceptual. Even assuming that a death penalty statute could have "too many" aggravating factors rendering a first degree murder defendant eligible for the death penalty, how many aggravating factors are "too many"? In a thorough decision, a trial court in Delaware, a state whose death penalty statute has a number of death-eligibility factors comparable to that of Illinois, thoughtfully reasoned:

"While the Court does not dispute that at first blush the defendant's argument appears logical, it is disturbed by the prospect of how one determines the point at which the number of aggravating circumstances causes the death penalty statute to be generally unconstitutional. Is the

Court to engage in some mathematical calculation as to who might be covered by the statute and who is not; and if so, what would be reasonable and logical factors to include in the formula? Can the Court arbitrarily declare that fifty aggravating circumstances is too many but forty-nine is permissible? Even assuming one could ever create a tool that would measure the percentage of defendants eligible for capital punishment, where is the dividing line of constitutionality and who makes that decision?" *State v. Steckel*, 708 A.2d 994, 1000 (Del. Super. 1996).

Affirming this reasoning, the Delaware Supreme Court concluded that, absent factual substantiation, the remaining inquiry was whether an *individual* aggravating factor could apply to *any* first degree murder defendant, not whether all aggravating factors *combined* apply to virtually all defendants convicted of first degree murder. *Steckel v. State*, 711 A.2d 5, 12-13 & n.11 (Del. 1998) (noting that although too many aggravating factors may violate constitutional principles, the defendant had not shown that such a limit had been reached in Delaware), citing *Arave v. Creech*, 507 U.S. 463, 474, 123 L. Ed. 2d 188, 200, 113 S. Ct. 1534, 1542 (1993).

We lastly observe that " 'defendant has not demonstrated on this record, or through sources of which we might take judicial notice, that his claims are empirically accurate, or that, if they were correct, this would require the invalidation of the death penalty law.' " (Emphasis omitted.) *People v. Crittenden*, 9 Cal. 4th 83, 155, 885 P.2d 887, 930, 36 Cal. Rptr. 2d 474, 517 (1994), quoting *People v. Wader*, 5 Cal. 4th 610, 669, 854 P.2d 80, 114, 20 Cal. Rptr. 2d 788, 822 (1993). Defendant does not substantiate this contention in any way. "As we are presently informed" (*Pulley v. Harris*, 465 U.S. 37, 54, 79 L. Ed. 2d 29, 42, 104 S. Ct. 871, 881 (1984)), we cannot say that the Illinois death penalty statute is unconstitutional in this regard.

## B. *Remaining Challenges*

Defendant makes several additional constitutional

challenges to the Illinois death penalty statute. However, this court has previously rejected the argument that the Illinois death penalty statute is unconstitutional because: (1) it does not require, at the second phase of the death sentencing hearing, the State to prove beyond a reasonable doubt that there are no mitigating factors sufficient to preclude imposition of the death penalty (*People v. Davis*, 205 Ill. 2d 349, 372-75 (2002)); (2) it places a burden of proof on a defendant that precludes meaningful consideration of mitigation evidence (*People v. Williams*, 193 Ill. 2d 306, 376 (2000)); (3) it permits the sentencing body to weigh the "vague" aggravating factor of "any other reason" a defendant should be sentenced to death (*People v. Kirchner*, 194 Ill. 2d 502, 558-59 (2000)); (4) it fails to sufficiently minimize the risk of arbitrarily imposed death sentences (*Gilliam*, 172 Ill. 2d at 522-23); and (5) the death eligibility factor for murder committed in a "cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design" (720 ILCS 5/9—1(b) (11) (West 1996)) is unconstitutionally vague (*People v. Hall*, 194 Ill. 2d 305, 358 (2000)). Defendant has not persuaded us to overturn these decisions.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed. We direct the clerk of this court to enter an order setting Tuesday, January 14, 2003, as the date on which the sentence of death, entered by the circuit court of Du Page County, shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1996). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is confined.

*Affirmed.*

Supplemental Opinion Upon Denial of Rehearing

In his petition for rehearing in this case, defendant raises but a single issue. It concerns his argument that the Illinois death penalty statute is unconstitutional because it does not require the State to prove beyond a reasonable doubt that there are no mitigating factors sufficient to preclude imposition of the death penalty. He contends that a recent decision by the Supreme Court, which we did not address in our original disposition of the case, calls our resolution of this issue into question. See *Ring v. Arizona*, 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428 (2002). We find the case distinguishable.

In *Ring* the Court considered the constitutionality of Arizona's death penalty scheme, and found it wanting. In doing so, the Court reversed an earlier decision which upheld the constitutionality of death penalty procedure in Arizona, and disavowed a related portion of *Apprendi*. See *Walton v. Arizona*, 497 U.S. 639, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990); *Apprendi*, 530 U.S. at 496-97, 147 L. Ed. 2d at 459, 120 S. Ct. at 2366, quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 257 n.2, 140 L. Ed. 2d 350, 377 n.2, 118 S. Ct. 1219, 1237 n.2 (1998) (Scalia, J., dissenting, joined by Stevens, Souter and Ginsburg, JJ.).

The constitutional infirmity the Court identified in *Ring* was that the Arizona death penalty scheme removed from the jury the determination of facts required to establish the defendant's eligibility for a death sentence—specifically, the finding of aggravating factors. "Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' *Apprendi*, 530 U.S., at 494, n. 19, the Sixth Amendment requires that they be found by a jury." *Ring*, 536 U.S. at 609, 153 L. Ed. 2d at 577, 122 S. Ct. at 2443.

Defendant contends that his sentence was unconstitutional according to the reasoning of *Ring*. He argues that under the Illinois first degree murder statute, lack of

mitigating factors sufficient to preclude death is a fact, which must be found unanimously by a jury before a defendant can be sentenced to death. See 720 ILCS 5/9—1(g), (h) (West 1996). Defendant contends that it is inaccurate to conclude that the death penalty is authorized by the facts found by the jury after the first stage of death penalty proceedings, because this second finding must still be made, unanimously, before that penalty can be imposed.

This argument appears to find some support in *Ring*. There, one of Arizona's arguments was that the defendant was "sentenced within the range of punishment authorized by the jury verdict" because he "was convicted of first-degree murder, for which Arizona law specifies 'death or life imprisonment' as the only sentencing options." *Ring*, 536 U.S. at 603-04, 153 L. Ed. 2d at 573, 122 S. Ct. at 2440. The Court rejected this argument, stating that the Arizona statutory scheme " 'authorizes a maximum penalty of death only in a formal sense' " (*Ring*, 536 U.S. 604, 153 L. Ed. 2d at 573-74, 122 S. Ct. at 2440, quoting *Apprendi*, 530 U.S. at 541, 147 L. Ed. 2d at 486, 120 S. Ct. at 2389 (O'Connor, J., dissenting, joined by Rehnquist, C.J., Kennedy and Breyer, JJ.)) because a finding of an aggravating circumstance was a necessary prerequisite to any death sentence. "Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' *Apprendi*, 530 U.S., at 494, n.19, the Sixth Amendment requires that they be found by a jury." *Ring*, 536 U.S. at 609, 153 L. Ed. 2d at 577, 122 S. Ct. at 2443. The inquiry " 'is one not of form, but of effect.' [*Apprendi*, 530 U.S.] at 494. If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602, 153 L. Ed. 2d at 572, 122 S. Ct. at 2439.

However, we do not find *Ring* dispositive. As a threshold matter in terms of *Apprendi* analysis, it is not beyond question that the finding at issue in the instant case—"that there are no mitigating factors sufficient to preclude the imposition of the death sentence" (720 ILCS 5/9—1(g), (h) (West 1998))—is properly characterized as "factual." The second stage of Illinois capital sentencing proceedings clearly bears a marked resemblance to the balancing of factors in which trial courts traditionally engage in determining what sentence to impose within a statutory range, a practice of which *Apprendi* explicitly approved. *Apprendi*, 530 U.S. at 481, 147 L. Ed. 2d at 449-50, 120 S. Ct. at 2358.

Moreover, this case diverges from *Ring* because defendant's complaint concerns mitigating, not aggravating, factors. See *Apprendi*, 530 U.S. at 490 n.16, 147 L. Ed. 2d at 455 n.16, 120 S. Ct. at 2363 n.16 (noting "the distinction the Court has often recognized [citation] between facts in aggravation of punishment and facts in mitigation"). We note that the statute at issue in *Ring* provided that the court "shall impose a sentence of death if the court finds one or more of the aggravating circumstances enumerated in subsection G of this section *and that there are no mitigating circumstances sufficiently substantial to call for leniency*." (Emphasis added.) Ariz. Rev. Stat. Ann. § 13—703 (F) (West Supp. 2001). However, the Court only discussed the extension of *Apprendi* to the finding of *aggravating* circumstances. The Court specifically noted that the defendant Ring was making no claim with respect to mitigating circumstances, and noted that in *Apprendi* there had been a distinction drawn between facts in aggravation and facts in mitigation (*Ring*, 536 U.S. at 597-98 n.4, 153 L. Ed. 2d at 569 n.4, 122 S. Ct. at 2437 n.4, quoting *Apprendi*, 530 U.S. at 490 n.16, 147 L. Ed. 2d at 455 n.16, 120 S. Ct. at 2363 n.16), suggesting that a different result might obtain if

an *Apprendi* challenge were raised in a mitigating factor context.

*Ring* is distinguishable. Also, as we noted in our original disposition of this case, this court has previously decided this question. See *People v. Davis*, 205 Ill. 2d 349, 372-75 (2002). As we have previously stated in the *Apprendi* context,

> "We are bound to follow the United States Supreme Court's interpretation of the Constitution of the United States. *People v. Gersch*, 135 Ill. 2d 384, 398 (1990); *People v. Loftus*, 400 Ill. 432, 436 (1948). See also *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 4 L. Ed. 97 (1816). But we are not bound to extend the decisions of the Court to arenas which it did not purport to address, which indeed it specifically disavowed addressing, in order to find unconstitutional a law of this state. This is especially true where, as here, to do so would require us to overrule settled law in this state." *People v. Wagener*, 196 Ill. 2d 269, 287 (2001).

The above remains an accurate expression of the philosophy of this court. The motion for rehearing is denied.

JUSTICE McMORROW, specially concurring:

I agree with the majority that defendant's convictions and sentences should be affirmed. I write separately to comment on defendant's argument that the Illinois death penalty statute is unconstitutional because it fails to adequately narrow the class of defendants eligible for the death penalty.

In *Furman v. Georgia*, 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972), the United States Supreme Court held unconstitutional the death penalty statutes of Georgia, Texas and other states, which left the decision of whether to impose a sentence of death for a capital offense to the unfettered discretion of a judge or jury. Although there was no majority opinion in *Furman*, each of the justices who made up the *Furman* majority and, in particular, Justices Stewart, White and Douglas, voiced

concern about the infrequent[1] and arbitrary manner in which the death penalty was then imposed under the existing discretionary sentencing schemes. The relative infrequency with which the death penalty was then being administered, and the lack of any limits on the sentencer's discretion to impose the death penalty, led Justice Stewart to conclude that the death penalty schemes at issue in *Furman* allowed the death sentence to be "wantonly" and "freakishly imposed." *Furman*, 408 U.S. at 310, 33 L. Ed. 2d at 390, 92 S. Ct. at 2763 (Stewart, J., concurring). Thus, according to Justice Stewart, the death sentences in *Furman* were

> "cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of [capital offenses], many just as reprehensible as [the offenses at issue], the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed." *Furman*, 408 U.S. at 309-10, 33 L. Ed. 2d at 390, 92 S. Ct. at 2762 (Stewart, J., concurring).

The views of Justice White were similar to those expressed by Justice Stewart. In his concurrence, Justice White observed that, under the death penalty statutes at issue in *Furman*, "the death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." *Furman*, 408 U.S. at 313, 33 L. Ed. 2d at 392, 92 S. Ct. at 2764 (White, J., concurring); see also *Furman*, 408 U.S. at 253, 33 L. Ed. 2d at 357, 92 S. Ct. at 2734 (Douglas, J., concurring) ("Under these laws no

---

[1]Studies cited in *Furman* estimated that, in the late 1960s and early 1970s, only 15 to 20% of death-eligible murderers were actually sentenced to death. See, *e.g.*, *Furman*, 408 U.S. at 386 n.11, 33 L. Ed. 2d at 434 n.11, 92 S. Ct. at 2802 n.11 (Burger, C.J., dissenting, joined by Blackmun, Powell and Rehnquist, JJ.); 408 U.S. at 309 n.10, 33 L. Ed. 2d at 390 n.10, 92 S. Ct. at 2762 n.10 (Stewart, J., concurring).

standards govern the selection of the penalty. People live or die, dependent on the whim of one man or of 12").

Four years after *Furman*, the Supreme Court again addressed the constitutionality of Georgia's death penalty statute in *Gregg v. Georgia*, 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976). The Georgia statute at issue in *Gregg*, which had been amended in response to *Furman*, narrowed the range of offenses for which the death penalty was available. Much like Illinois' current death penalty statute, the amended Georgia statute provided that a defendant would be eligible for the death penalty only if the circumstances of the murder met one of several statutorily defined aggravating or eligibility factors.

The Supreme Court upheld the amended Georgia statute. As in *Furman*, there was no majority opinion in *Gregg*. However, the two concurring opinions of the Court, authored by Justice Stewart and Justice White, understood the meaning of *Furman* in similar terms:

> "*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189, 49 L. Ed. 2d at 883, 96 S. Ct. at 2932 (opinion of Stewart, Powell and Stevens, JJ.).

> "In *Furman*, this Court held that as a result of giving the sentencer unguided discretion to impose or not to impose the death penalty for murder, the penalty was being imposed discriminatorily, wantonly and freakishly, and so infrequently that any given death sentence was cruel and unusual". *Gregg*, 428 U.S. at 220-21, 49 L. Ed. 2d at 901, 96 S. Ct. at 2947 (White, J., concurring, joined by Burger, C.J., and Rehnquist, J.).

With this understanding of *Furman*, the Court in *Gregg* concluded that the amended Georgia statute eliminated the constitutional problem of arbitrariness. Critical to this decision was the fact that, under the new

statute, the statutory aggravating factors limited the number of capital offenses. By narrowing the number of offenses for which the death penalty was available to a select few, the amended statute necessarily reduced the risk of arbitrary and capricious sentencing. Justice White explained:

> "As the types of murders for which the death penalty may be imposed become more narrowly defined and are limited to those which are particularly serious or for which the death penalty is peculiarly appropriate *** it becomes reasonable to expect that juries—even given discretion *not* to impose the death penalty—will impose the death penalty in a substantial portion of the cases so defined. If they do, it can no longer be said that the penalty is being imposed wantonly and freakishly or so infrequently that it loses its usefulness as a sentencing device." (Emphasis in original.) *Gregg*, 428 U.S. at 222-23, 49 L. Ed. 2d at 901-02, 96 S. Ct. at 2947-48 (White, J., concurring, joined by Burger, C.J., and Rehnquist, J.).

This principle—that a narrowly drawn death penalty statute reduces the risk of arbitrary and capricious sentencing—was later explained in these terms:

> "[T]he risk of arbitrariness condemned in *Furman* is a function of the size of the class of convicted persons who are eligible for the death penalty. When *Furman* was decided, Georgia included virtually all defendants convicted of forcible rape, armed robbery, kidnapping, and first-degree murder in that class. As the opinions in *Furman* observed, in that large class of cases race and other irrelevant factors unquestionably played an unacceptable role in determining which defendants would die and which would live. However, the size of the class may be narrowed to reduce sufficiently that risk of arbitrariness, even if a jury is then given complete discretion to show mercy when evaluating the individual characteristics of the few individuals who have been found death eligible." *Walton v. Arizona*, 497 U.S. 639, 715-16, 111 L. Ed. 2d 511, 568, 110 S. Ct. 3047, 3090 (1990) (Stevens, J., dissenting).

In cases following *Gregg*, the United States Supreme

Court has continued to reaffirm the principle that death penalty statutes must be narrowly circumscribed:

"To avoid [the] constitutional flaw [of arbitrary and capricious sentencing], an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.

\*\*\*

Our cases indicate, then, that statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty." *Zant v. Stephens*, 462 U.S. 862, 877-78, 77 L. Ed. 2d 235, 249-50, 103 S. Ct. 2733, 2742-43 (1983).

See also *Pulley v. Harris*, 465 U.S. 37, 50, 79 L. Ed. 2d 29, 40, 104 S. Ct. 871, 879 (1984) (noting the "constitutionally necessary narrowing function of statutory aggravating circumstances"); *McCleskey v. Kemp*, 481 U.S. 279, 305, 95 L. Ed. 2d 262, 287, 107 S. Ct. 1756, 1774 (1987) (state may not impose death unless it has "rational criteria that narrow the decisionmaker's judgment"); *Tuilaepa v. California*, 512 U.S. 967, 972, 129 L. Ed. 2d 750, 759, 114 S. Ct. 2630, 2635 (1994) (narrowing circumstances "must apply only to a subclass of defendants convicted of murder").

In the case at bar, defendant argues that the Illinois' death penalty statute is unconstitutional because, when the statutory aggravating factors are considered in the aggregate, the statute fails to "genuinely narrow the class of persons eligible for the death penalty." *Zant*, 462 U.S. at 877, 77 L. Ed. 2d at 249, 103 S. Ct. at 2742. Defendant's argument is an attack on the death penalty scheme *as a whole* and is essentially the same argument addressed by the Supreme Court in *Furman*. Defendant argues that all, or nearly all, of the first degree murders in Illinois are rendered death eligible by the large number of aggravating factors contained within our death penalty

statute. Because each statutory aggravating factor potentially subjects a defendant to the same penalty, *i.e.*, death, it follows that the circumstances of the murders covered by the various aggravating factors must be considered equally reprehensible. Yet, only a small percentage of first degree murder defendants actually receive the death penalty. Thus, at root, defendant's argument is that Illinois' current death penalty scheme is no different from the schemes held unconstitutional in *Furman*. In essence, defendant is contending that his death sentence is "cruel and unusual in the same way that being struck by lightning is cruel and unusual" (*Furman*, 408 U.S. at 309, 33 L. Ed. 2d at 390, 92 S. Ct. at 2762 (Stewart, J., concurring)), for of all the defendants eligible for the death penalty in Illinois, many convicted of murders just as reprehensible as the murder at issue in this case, defendant is "among a capriciously selected random handful upon whom the sentence of death has in fact been imposed" (*Furman*, 408 U.S. at 309-10, 33 L. Ed. 2d at 390, 92 S. Ct. at 2762 (Stewart, J., concurring)).

The current Illinois death penalty statute contains 20 aggravating factors which render a first degree murder death eligible. These factors are:

(1) The murder victim was a police officer or firefighter killed in the course of performing his official duties, to prevent the performance of official duties, or in retaliation for performing official duties.

(2) The murder victim was an employee of an institution or facility of the Department of Corrections or any similar local correctional agency and was killed in the course of performing official duties, to prevent the performance of official duties, or in retaliation for performing official duties. Or the victim was an inmate at such an institution or facility.

(3) The defendant has been convicted of the first degree murder of two or more individuals, regardless of whether the deaths were the result of the same or several acts.

(4) The murder victim was killed as a result of the

hijacking of an airplane, train, ship, bus or other public conveyance.

(5) The defendant committed the murder pursuant to a contract, agreement or understanding by which he was to receive money or anything of value in return for committing the murder, or the defendant procured another to commit the murder for money or anything of value.

(6) The defendant murdered the victim in the course of one or more predicate felony offenses. The defendant must have actually killed or injured the victim, and the defendant must have acted with the intent to kill or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual or another. The predicate felonies for this factor are: armed robbery, armed violence, robbery, predatory criminal sexual assault of a child, aggravated criminal sexual assault, aggravated kidnapping, aggravated vehicular hijacking, forcible detention, arson, aggravated arson, aggravated stalking, burglary, residential burglary, home invasion, calculated criminal drug conspiracy, streetgang criminal drug conspiracy, or the attempt to commit any of the foregoing felonies.

(7) The murder victim was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty.

(8) The defendant committed the murder to prevent the victim from testifying in a criminal prosecution or giving material assistance to the State. Or the defendant committed the murder because the victim was a witness in a prosecution or gave material assistance to the State.

(9) The defendant, while committing one of several drug offenses, or while engaged in a conspiracy or solicitation to commit such an offense, murdered the victim or commanded the murder.

(10) The defendant, while incarcerated, and while committing a felony offense or while engaged in a conspiracy or solicitation to commit a felony offense, murdered the victim or commanded the murder.

(11) The murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design.

(12) The murder victim was an emergency medical technician, paramedic, ambulance driver, or another medical assistance official, employed by a municipality or other governmental unit and was killed in the course of performing official duties.

(13) The defendant was the leader of a criminal drug conspiracy and caused or commanded the victim's murder.

(14) The murder was intentional and involved the use of torture.

(15) The defendant shot the murder victim with a firearm fired from a motor vehicle.

(16) The murder victim was 60 years of age or older and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty.

(17) The murder victim was a physically or mentally disabled person and the defendant knew or should have known that the victim was disabled.

(18) The murder was committed by reason of any person's activity as a community policing volunteer or to prevent any person engaging in activity as a community policing volunteer.

(19) The murder victim had an order of protection against the defendant.

(20) The murder victim was known by the defendant to be a teacher or other person employed in any school and the victim was on or near school grounds.

See 720 ILCS 5/9—1(b)(1) (West 2000).

As the foregoing list shows, the Illinois death penalty statute appears on its face to be quite extensive. Indeed, the current number of aggravating factors is almost three times what it was when the statute was first enacted and is one of the highest in the country. See *Fixing the Death Penalty*, Chi. Trib., December 29, 2000, at 22 (noting that, in 2000, only the death penalty statutes in Delaware and California, with 22 aggravating factors each, had more aggravating factors than Illinois); see also A. Chambers, *Political Aggravation*, Ill. Issues, October 2001, at 30, 32-33. Not only is the total number of aggravating factors high but, in addition, some of the ag-

gravating factors are individually broad. The felony-murder factor (720 ILCS 5/9—1(b)(6) (West 2000)), for example, contains some 15 predicate felonies. Thus, while that factor is narrowly drawn in the sense that it requires both actual participation in the killing by the defendant and intent, the long list of felonies makes a large number of first degree murders death eligible. The "cold, calculated and premeditated" factor (720 ILCS 5/9—1(b)(11) (West 2000)) also has a broad reach. To establish death eligibility under this factor, the State must prove that the murder was "deliberated or reflected upon for an extended period of time." *People v. Williams*, 193 Ill. 2d 1, 37 (2000) (plurality op.). This court has held that the period of deliberation may be as little as three hours. See *People v. Brown*, 169 Ill. 2d 132, 166-67 (1996); *Williams*, 193 Ill. 2d at 33 (plurality op.), citing *Brown*, 169 Ill. 2d at 166-67. Thus, for a first degree murder *not* to be death eligible in Illinois, the murder must be of a single individual, the victim must *not* be one of those listed among the aggravating factors (*e.g.*, community policing volunteer, teacher), the murder must be unaccompanied by any of the 15 felonies contained in the felony-murder aggravating factor, and the murder must be deliberated upon for *less* than three hours. Considering these facts, one would be tempted to conclude that, in Illinois, "it is virtually impossible to find a murder case that is not potentially death-eligible." T. Sullivan, *Repair or Repeal—Report of the Governor's Comm'n on Capital Punishment*, 90 Ill. B.J. 304, 306 (2002).

Furman and its progeny can be read as providing guidelines for determining how narrowly a death penalty statute must be drawn to satisfy constitutional concerns. See S. Shatz & N. Rivkind, *The California Death Penalty Scheme: Requiem for Furman?*, 72 N.Y. L. Rev. 1283 (1997). Regardless of where the line is ultimately drawn, however, the question of whether the constitutional

requirement of narrowing has occurred is a factual one. 72 N.Y. L. Rev. at 1318. In other words, to determine whether the Illinois death penalty statute is actually narrowing the pool of death-eligible defendants, we must know what the scope of the statute is with respect to actual cases. We must have some idea, for example, what percentage of first degree murder defendants are potentially death eligible and what percentage of those defendants actually receive the death penalty. Defendant, however, has not supplied us with this information. Although one might suspect that relatively few first degree murders in Illinois are not death eligible, suspicion is not a substitute for evidence. We cannot answer defendant's argument without the pertinent empirical data. Accordingly, defendant's contention that the death penalty statute is unconstitutional fails in this case, not as a matter of law, but rather, as the majority notes, because defendant has failed to "substantiate [his] contention in any way." 206 Ill. 2d at 200.

The court's rejection of defendant's constitutional argument in this case should not be viewed as diminishing the importance of the general policy issue which he has raised. Among the numerous organizations which have examined the scope of the Illinois death penalty statute, there is unanimous agreement that, as a matter of legislative policy, the Illinois death penalty statute is overbroad. Foremost among these organizations is Governor Ryan's Commission on Capital Punishment. This 14-member commission,[2] created by Governor Ryan to study the capital punishment system in Illinois, was charged with making "recommendations to the governor

---

[2]The commission members included both former or current prosecutors and members of the defense bar. For a list of the commission members, see Report of the Governor's Commission on Capital Punishment, Preamble, at v through vii (April 2002). See also D. Vock, *Deadly Equation*, Ill. Issues, June 2002, at 17, 18.

'designed to further ensure the application and administration of the death penalty in Illinois is just, fair and accurate.' " 90 Ill. B.J. at 304. The commission has recently issued its report. One of the commission's principal, and unanimous, recommendations is that the number of aggravating factors in the Illinois death penalty statute should be reduced:

> "It appeared to the members of the Commission that to the extent that the death penalty was to remain an effective statute in terms of achieving its constitutional objective of narrowing the class of cases to which the penalty should be applied, the number of eligibility factors should be reduced. *** The Commission members unanimously expressed the view that the current proliferation of eligibility factors, as found in the Illinois death penalty statute, was unwise.
> ***
> Reducing the number of eligibility factors should lead to more uniformity in the way in which the death penalty is applied in Illinois, and provide greater clarity in the statute, while retaining capital punishment for the most heinous of homicides. The scope of the statute should be narrowed." Report of the Governor's Commission on Capital Punishment, ch. 4, at 67 (April 2002).

The Illinois Attorneys General Association, in response to the report of the Governor's commission, has expressed agreement that our death penalty statute is overly broad and has recommended that the number of aggravating factors be cut in half. See J. Crimmins, *Prosecutors Object to Quarter of Death Penalty Reforms*, Chi. Daily L. Bulletin, May 17, 2002, at 1, 24. The assembly of the Illinois State Bar Association has also recently voted in favor of reducing the number of aggravating factors. See J. Brunts, *ISBA Supports Execution Hold, Case Review*, Chi. Daily L. Bulletin, June 24, 2002, at 1. Even before the commission's report, both opponents and advocates of the death penalty in the academic community had recognized the need to reconsider and reduce the scope

of current death penalty statutes. See, *e.g.*, R. Blecker, *Among Killers, Searching for the Worst of the Worst*, Wash. Post, December 3, 2000, at B1 ("Execution is society's ultimate sanction, to be threatened rarely and applied even more rarely. We must rethink the death penalty, revise and refine our statutes. If we \*\*\* rethink it right, I am convinced we will end up converting the sentences of thousands of murderers presently on death row. The remaining few hundred monsters we should execute"); D. McCord, *An Open Letter to Governor George Ryan Concerning How to Fix the Death Penalty System*, 32 Loy. U. Chi. L.J. 451, 453 (2001) ("Aggravating factors in every jurisdiction are over-inclusive. While they render almost all the absolute worst murderers death-eligible, they also render defendants whose crimes are not as egregious death-eligible").

Each time an additional aggravating factor is added to our death penalty statute, the risk of arbitrary and capricious sentencing is increased. As Governor Ryan noted last year in vetoing a twenty-first aggravating factor passed by the legislature,[3] "as we continue to almost annually add eligibility factors to our death penalty statute, we introduce more arbitrariness and discretion and edge ever closer to our previous capital punishment system that was effectively held unconstitutional by the United States Supreme Court in 1972." Governor George Ryan's Veto Message, August 17, 2001, at 3. The federal constitution mandates that death penalty statutes be narrowly drawn. As the legislature considers proposed reforms to the Illinois death penalty statute (see A. Chambers, *The Future of Illinois' Death Penalty System is Now in Lawmakers' Hands*, Ill. Issues, June 2002, at

---

[3]The new aggravating factor would have made a defendant eligible for the death penalty where the murder was committed in furtherance of the activities of an organized gang. See 92d Ill. Gen. Assem., House Bill 1812, 2001 Sess.

6) reducing the breadth of the statute is a matter that should be given serious consideration.

CHIEF JUSTICE HARRISON, dissenting:

The proceedings which culminated in Ballard's convictions and sentence of death were fatally flawed because they did not comport with the new rules enacted by our court governing the conduct of cases in which the State is seeking the death penalty. For the reasons set forth in my dissenting opinion in *People v. Hickey*, 204 Ill. 2d 585, 631-36 (2001) (Harrison, C.J., dissenting), the procedures contained in those rules are indispensable for achieving an accurate determination of innocence or guilt and are applicable to all capital cases now coming before us. Because Ballard was tried, convicted and sentenced without the benefit of the new rules, his convictions and death sentence should be vacated, and the cause should be remanded to the circuit court for a new trial.

Even if Ballard were not entitled to the benefit of the new rules, his sentence of death could not stand. For the reasons set forth in my partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law is void and unenforceable because it violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Absent the new rules, there is no basis for altering that conclusion. At a minimum, Ballard's sentence of death should therefore be vacated, and he should be sentenced to a term of imprisonment. 720 ILCS 5/9—1(j) (West 1996).

JUSTICE KILBRIDE, also dissenting:

For the reasons set forth in my dissents in *People v. Hickey*, 204 Ill. 2d 585, 636-39 (2001) (Kilbride, J., dissenting), and *People v. Simpson*, 204 Ill. 2d 536, 581-85 (2001) (Kilbride, J., dissenting), defendant's convictions

and sentence should be set aside because the trial proceedings were not conducted in accordance with the new supreme court rules governing capital cases. The procedures in capital cases prior to this court's adoption of the new rules were unreliable and did not adequately protect a defendant's constitutional rights. Consequently, since the new rules were promulgated to address the deficiencies of constitutional dimension that regularly occurred under the old system, the rules must be applied retroactively to all capital cases currently pending on direct appeal. See *People v. Hudson*, 195 Ill. 2d 117, 126 (2001), citing *Griffith v. Kentucky*, 479 U.S. 314, 328, 93 L. Ed. 2d 649, 661, 107 S. Ct. 708, 716 (1987). For those reasons, I respectfully dissent.